Opinion issued on February 4, 2010









 



 







In The

Court of Appeals

For The

First District of Texas






NO. 01-09-00097-CV

NO. 01-10-00002-CV






D.P., Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from Probate Court No. 3

Harris County, Texas

Trial Court Cause No. 144,617






MEMORANDUM OPINION


 D.P. appeals from an order of commitment for temporary in-patient mental
health services (appellate cause no. 01-09-000097-CV) and from an order to
administer psychoactive medication (appellate cause no. 01-10-000002-CV). (1) In each
appeal, D.P. challenges the legal and factual sufficiency of the evidence to support
the findings on which each order is based. 

 We affirm both orders.

Background


 In 2004, D.P. was diagnosed with a chronic mental illness, paranoid
schizophrenia. When he took medication for his illness, D.P. functioned normally. 
In 2008, D.P. stopped taking his medication. Over several months, D.P.'s wife,
Stacey, detected a gradual change in D.P. Stacey noticed that D.P. was becoming
increasingly irrational, accusatory, and argumentative. He also had developed a
belief that terrorists were planning to attack him and his family. To protect his family
from the terrorists, appellant began leaving a loaded firearm out at night, despite
Stacey's concern for their three children, ages 12, 8, and 6.

 On January 9, 2009, D.P. and his family were sitting down for dinner when
D.P. became very angry and started yelling at his family. D.P. threw the beer bottle
from which he was drinking across the room. D.P. continued to yell at Stacey. He 
demanded that she tell him "who was doing this to our family." Stacey sent the
children to start their baths, while she went to the bedroom to get her bag. At the
same time, D.P. went to the closet and got a gun.

 Stacey told D.P. that she was going to leave with the children. D.P. blocked
the front door. Stacey asked D.P. to let her and the children leave. D.P. refused,
stating, "No, we're being attacked." Stacey grabbed her keys, but D.P. took them
from her. D.P. and Stacey then engaged in a physical struggle. Stacey called the
police and continued to beg D.P. to let her and the children leave. 

 Meanwhile, the three children were in a bedroom where Stacey had told them
to wait. When D.P. went to get something from another bedroom, Stacey grabbed her
daughter's house key and yelled for the children to come. D.P. returned before they
could leave the house. He insisted that they not leave and blocked the door with a
gun. Stacey later testified that the children were able to leave the house by walking
"under the gun." 

 Once outside, the children ran to a neighbor's house. Stacey stayed on the
telephone with the police. D.P. came out of the house and sat on the porch with a gun
in his hand. D.P. continued to yell that he was going to "get" whoever was attacking
his family. 

 After the police arrived, D.P. went into the house. The police stayed for four
hours but D.P. refused to come out. 

 On January 13, 2009, Stacey filed an application for court-ordered temporary
mental health services, seeking to have D.P. committed for temporary in-patient
treatment. As the basis for the application, Stacey cited D.P.'s conduct on January
9, 2009 when he had brandished the gun and refused to let the family leave. The
application was supported by Stacey's affidavit and two certificates of medical
examination. One of the certificates was signed by Dr. Jorge Raichman. Dr.
Raichman stated in the certificate that D.P. had been diagnosed with paranoid
schizophrenia. The doctor indicated that, in his opinion, D.P. was likely to cause
serious harm to others. In support of his opinion, Dr. Raichman identified the factual
basis of his opinion as follows: "[D.P.] pulled out an automatic weapon to defend his
home from imaginary intruders." 

 On January 15, 2009, the trial court placed D.P. into protective custody at West
Oaks Hospital pending the involuntary commitment hearing. The trial court ordered
that D.P. be examined further by Dr. Raichman. 

 While he was in the hospital, D.P. spoke with Stacey on the telephone. D.P.
continued to maintain that the family had been under threat of attack by terrorists on
the night of January 9. D.P. also told Stacey that he believed that Dr. Raichman was
a terrorist.

 Pending the temporary commitment hearing, D.P. refused to take medications
for his mental illness. Dr. Raichman filed a "Petition for Order to Administer
Psychoactive Medication," requesting the trial court to authorize the administration
of antipsychotic medication to D.P. 

 D.P. did not request a jury, and the trial court conducted the temporary
commitment hearing on January 23, 2009. Dr. Raichman, Stacey, and D.P.'s father
testified for the State. D.P. testified in his own defense. At the conclusion of the
hearing, the trial court granted Stacey's application to have D.P. temporarily
committed for in-patient treatment. The trial court indicated that it based its decision
on its finding that D.P. was likely to cause serious harm to others if he was not
involuntarily committed for treatment. 

 Following the hearing, the trial court signed an order of commitment for
temporary in-patient mental health services. The trial court ordered that D.P. be
committed to West Oaks Hospital for a period not to exceed 90 days. In its order, the
trial court indicated that it had found, by clear and convincing evidence, that D.P. is
mentally ill and is likely to cause serious harm to others.

 Immediately following the commitment hearing, the trial court conducted a
hearing on the Dr. Raichman's application to administer psychoactive medication. 
Dr. Raichman testified for the State, and appellant testified in his own defense. At
the conclusion of the hearing, the court signed an "Order to Administer Psychoactive
Medication," providing that antipsychotic medications could be administered to D.P.
during his 90-day temporary commitment. In the order, the trial court recited that it
found that the administration of the medication is in D.P.'s best interest and that D.P.
lacked the capacity to make a decision regarding the administration of the medication.

 D.P. appeals both orders.

Legal and Factual Sufficiency Challenges


 On appeal, D.P. challenges the legal and factual sufficiency of the evidence to
support the findings on which the commitment order and the order to administer
psychoactive medication are based. (2) 

A. Burden of Proof and Standards of Review

 To obtain either an order for temporary commitment or an order to administer
psychoactive medication, the Texas Legislature requires that the State prove its case
by clear and convincing evidence. See Tex. Health & Safety Code Ann.
§ 574.034(a) (Vernon 2003), § 574.106(a-1) (Supp. 2009). In this context, "clear and
convincing evidence" means "that measure or degree of proof which will produce in
the mind of the trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established." State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979). 
Because the State's burden of proof is clear and convincing evidence, we apply a
heightened standard of review to sufficiency-of-the-evidence challenges. See In re
C.H., 89 S.W.3d 17, 25 (Tex. 2002). 

 In evaluating the legal sufficiency of the evidence, we review all the evidence
in the light most favorable to the finding to determine whether a reasonable factfinder
could have formed a firm belief or conviction that the finding was true. See In re
J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). In doing so, we assume the factfinder
resolved disputed facts in favor of the finding if a reasonable factfinder could do so,
and we disregard all evidence that a reasonable factfinder could have disbelieved or
found to have been incredible. Id. 

 Likewise, the higher burden of proof alters the appellate standard of factual
sufficiency review. C.H., 89 S.W.3d at 25-26. In reviewing the evidence for factual
sufficiency under the clear and convincing standard, we inquire "whether the
evidence is such that a factfinder could reasonably form a firm belief or conviction
about the truth of the State's allegations." See id. at 25. We must consider all the
evidence in the record, both that in support of and contrary to the trial court's
findings. See id. at 27-28. This Court must give due consideration to evidence that
the factfinder could reasonably have found to be clear and convincing. See id. at 25. 
We must consider whether disputed evidence is such that a reasonable trier of fact
could not have reconciled the disputed evidence in favor of its finding. Id.

B. Commitment Order

 We have recognized that "a person may not be deprived of his liberty by a
temporary involuntary commitment unless there is a showing of a substantial threat
of future harm to himself or others." Taylor v. State, 671 S.W.2d 535, 538 (Tex.
App.--Houston [1st Dist.] 1983, no writ). Health and Safety Code subsection
574.034(a) provides that the judge may order a proposed patient to receive
court-ordered temporary inpatient mental health services only if the judge or a jury
finds, from clear and convincing evidence, that:

 (1) the proposed patient is mentally ill; and

 (2) as a result of that mental illness the proposed patient:


 (A) is likely to cause serious harm to himself;


 (B) is likely to cause serious harm to others; or


 (C) is:


 (i) suffering severe and abnormal mental, emotional, or
physical distress;


 (ii) experiencing substantial mental or physical
deterioration of the proposed patient's ability to
function independently, which is exhibited by the
proposed patient's inability, except for reasons of
indigence, to provide for the proposed patient's
basic needs, including food, clothing, health, or
safety; and


 (iii) unable to make a rational and informed decision as
to whether or not to submit to treatment. 


Tex. Health & Safety Code Ann. § 574.034(a).


 Subsection 574.034(c) requires that, if the judge or a jury finds that the
proposed patient meets the commitment criteria prescribed by subsection (a), the
judge or the jury must specify which criterion listed in subsection (a)(2) forms the
basis for that decision. Id. § 574.034(c). Our review is limited to the criteria actually
identified. See Johnstone v. State, 961 S.W.2d 385, 388 (Tex. App.--Houston [1st
Dist.] 1997, no writ). 

 In this case, the trial court indicated that it based the commitment order on the
second statutory criterion. See Tex. Health & Safety Code Ann.
§ 574.034(a)(2)(B). The commitment order reflects that the trial court, as fact finder
in this case, found that D.P. is likely to cause serious harm to others. See id.

 The Health and Safety Code further requires that, to be clear and convincing
under subsection 574.034(a), the evidence must include expert testimony and, unless
waived, (3) evidence of a recent overt act or a continuing pattern of behavior that tends
to confirm:

 (1) the likelihood of serious harm to the proposed patient or others; or

 (2) the proposed patient's distress and the deterioration of the proposed
patient's ability to function.


Id. § 574.034(d). The trial court need not specify which of the two bases listed in
subsection 574.034(d) supports its subsection 574.034(a) findings. See J.M. v. State,
178 S.W.3d 185, 191 (Tex. App.--Houston [1st Dist.] 2005, no pet.) (citing M.S. v.
State, 137 S.W.3d 131, 135 n.5 (Tex. App.--Houston [1st Dist.] 2004, no pet.)). 
However, the recent overt act or continuing pattern of behavior proven by the State
must relate to the criterion on which the judgment is based. Id. at 193; In re C.O., 65
S.W.3d 175, 181 (Tex. App.--Tyler 2001, no pet).

 To support commitment, the State offered Stacey's testimony in which she
detailed the events of January 9, 2009. Stacey recounted how, at dinnertime, D.P.
became "very angry very quickly" and "threw a beer bottle across the floor." Stacey
testified that he threw the bottle "not at anybody, but in anger." Stacey described how
D.P. began yelling at her and their children and demanded that she tell him "who was
doing this to our family." 

 Stacey testified that, when she went to get her bag to leave, "[D.P.] got a gun
out of the closet . . . and stood at my front door and he would not let me leave with
our children." Stacey related that she then asked D.P. "nicely" to let them leave, but
he refused, stating, "No, we're being attacked." 

 Stacey testified, "I tried to grab my keys. He took them from me. There was
a physical struggle." At that point, Stacey called the police. 

 Stacey described how she then took action to distract D.P. When he left the
room, she grabbed her daughter's house key and called the children to come. But
then, "[D.P.] came from around the corner, still insistent that we not leave. He put
the gun in front of the door and my children couldn't leave and I was in between the
girls. . . . My children went under the gun to leave the house, and we got outside." 
 Stacey testified that D.P. then "came outside, sat on the porch with the gun in
hand, and he was yelling that he's going to get whoever is attacking us." When he
heard the police sirens, D.P. went into the house. For the next four hours, Stacey,
D.P.'s father, and the police tried to convince D.P. to come out of the house, but he
refused.

 D.P. contends that Stacey's testimony regarding the events of January 9 is
legally insufficient to support a finding in support of temporary commitment. D.P.
argues that the evidence does not show a recent overt act or a continuing pattern of
behavior that tends to confirm the likelihood that D.P. would cause serious harm to
others, as required by subsection 574.034(d). See Tex. Health & Safety Code
Ann. § 574.034(d). More specifically, D.P. contends that the record contains no
evidence to show that D.P. "ever harmed or threatened to harm anyone." 

 D.P.'s appellate argument does not appropriately view Stacey's testimony in
the light most favorable to the trial court's finding supporting commitment, as
required in a legal-sufficiency review. When viewed through such prism, Stacey's
testimony showed that, in response to a delusional threat, D.P. (1) threw a beer bottle
in anger in the presence of his family, (2) shouted at Stacey and the children, (3)
retrieved a gun when Stacey said that she and the children were leaving, (4) refused
to allow the family to leave, (5) physically blocked the door with his body and with
a gun, (6) grabbed Stacey's keys from her to prevent her from leaving, (7) engaged
in a physical struggle with Stacey, (8) went outside with his gun and sat on the porch,
and (9) began shouting that he would "get" who was attacking the family. 

 To support commitment, a threat of harm to others must be substantial and
based on actual dangerous behavior manifested by some overt act or threats in the
recent past. See Taylor, 671 S.W.2d at 538. Here, the State, through Stacey's
testimony, presented such evidence. 

 We conclude that the State introduced legally sufficient evidence to prove an
overt act by D.P. that tended to confirm the likelihood of serious harm to others. That
is, considering the evidence as we must, we conclude that a reasonable trier of fact
could have formed a firm belief or conviction that D.P. was likely to cause serious
harm to others. See Tex. Health & Safety Code Ann. § 574.034(a)(2)(B); see also
id. § 574.034(d). Accordingly, we hold that the evidence is legally sufficient to
support the trial court's commitment order.

 D.P. also contends that the record contains factually insufficient evidence to
support the commitment order because the evidence did not show that D.P. "ever
harmed or threatened to harm anyone." D.P. points out that he explained at the
hearing that he threw the beer bottle because the beer tasted like "pure alcohol." 
Indeed, D.P.'s testimony at the hearing indicated that he threw the bottle and became
angry because he thought that the terrorists had poisoned his beer. D.P. also points
out that Stacey testified that he did not throw the bottle at her or the children, but
threw it "in anger."

 D.P. also cites Stacey's testimony that D.P. had continuously owned guns since
they were married and that "it had never been an issue before." D.P. further points
out that he did not engage in a confrontation with the police but stayed in the house. 
Lastly, D.P. calls attention to the fact that Dr. Raichman based his testimony that D.P.
was "likely to hurt somebody" on Stacey's account of the episode, not on personal
observations. 

 In addressing D.P.'s factual sufficiency complaint, we give due consideration
to evidence that the factfinder could have reasonably found to be clear and
convincing. See C.H., 89 S.W.3d at 25; see also Tex. Health & Safety Code Ann.
§ 574.034(a)(2)(B). Giving due consideration to Stacey's testimony, as discussed
supra, the evidence cited by D.P. does not invalidate or fatally undermine the State's
showing that D.P. engaged in a recent overt act that tends to confirm the likelihood
that D.P. would cause serious harm to others.

 In addition, the substantial threat of harm to others posed by D.P. becomes
even more apparent when the events of January 9, 2009 are viewed in the context of
the entire record. See Taylor, 671 S.W.2d at 538. The evidence showed that, in the
months before the incident, D.P. had become increasingly irrational, accusatory, and
argumentative. D.P. suffered from the persistent delusion that he and his family were
under the threat of being attacked by terrorists. Stacey testified that in the past, D.P.
had episodes where he stayed in bed and had quit several jobs because he feared
being attacked. But with this episode, Stacey testified that D.P. had shown "more
anger." D.P. had also recently started leaving a loaded firearm unsecured at night,
despite the fact that young children were in the home. The evidence showed that D.P.
owned a number of guns; Stacey referred to D.P. as a "collector" of guns. 

 The evidence further showed that D.P.'s delusions regarding terrorists
continued to persist. At the time of the hearing, D.P. continued to believe in the
validity of his delusions. D.P. testified that, on the night of the incident, the terrorists
had poisoned his beer. D.P. expressed great disappointment in Stacey that she would
not assist him in protecting their family from the terrorists. The evidence also showed
that he considered Dr. Raichman to be a terrorist. 

 We acknowledge that the State must show more than delusions or other facts
that merely confirm a proposed patient's mental illness to meet the evidentiary
standard for a temporary commitment. See C.O., 65 S.W.3d at 182. Here, the State
has made such a showing. D.P.'s delusions involved threats of violence, that in turn
caused D.P. to arm himself with a firearm and temporarily hold his family against
their will. Such a scenario shows that a substantial threat of harm to others is likely
to occur. 

 We do not take the deprivation of D.P.'s liberty lightly; however, the facts of
this case reveal a recipe for disaster: a mentally ill man suffering from delusions of
threats of violence, who has demonstrated a willingness to respond to his delusions
by using firearms. We agree with our sister court that "Texas law does not require
relatives or physicians of the mentally ill (or the courts) to stand idly by until serious
harm occurs. . . . The purpose of temporary commitment is to avoid just such harm." 
See In re G.H. v. State, 94 S.W.3d 115, 117 (Tex. App.--Houston [14th Dist.] 2002,
no pet.).

 In light of the entire record, we conclude that the trial court could have
reasonably formed a firm belief or conviction that D.P. was likely to cause harm to
others. See C.H., 89 S.W.3d at 25. We hold that the evidence is factually sufficient
to support the trial court's commitment order. 

 We overrule D.P.'s sole issue in appellate cause no. 01-09-00097-CV.

C. Medication Order

 A trial court may issue an order authorizing the administration of one or more
classes of psychoactive medications to a patient who is under a court order to receive
inpatient mental health services. Tex. Health & Safety Code Ann. § 574.106(a). (4)
 
The court may issue an order if it finds by clear and convincing evidence that (1) the
patient lacks the capacity to make a decision regarding the administration of the
proposed medication and (2) treatment with the proposed medication is in the best
interest of the patient. Tex. Health & Safety Code Ann. § 574.106(a-1).

 Here, D.P. asserts that the evidence was legally and factually insufficient to
show that he lacked the capacity to make a decision regarding the administration of
the proposed medication. The legislature has defined "capacity" as a patient's ability
to (1) understand the nature and consequence of a proposed treatment, including the
benefits, risks, and alternatives to the proposed treatment and (2) make a decision
whether to undergo the proposed treatment. Tex. Health & Safety Code Ann.
§ 574.101(1) (Vernon 2003). 

 At the medication hearing, Dr. Raichman again testified that D.P. suffers from
paranoid schizophrenia. Dr. Raichman explained both the benefits and side-effects
of the proposed antypschotic medication. With respect to the benefits, Dr. Raichman
testified, "The antypschotics will help delusions to attenuate or go away, and [the
patient's] judgment improves. They become more responsible and they are able to
function like everyone." Dr. Raichman explained that the side-effects include
involuntary movements of the lips and tongue, which usually occur after a number
of years of taking medication. He stated that less "malignant" side-effects include
sedation, dryness of the mouth, and constipation. Dr. Raichman testified that he had
explained the side-effects and the benefits of the proposed medication to D.P. 

 Dr. Raichman also told the trial court that an injectable form of the medication,
which need only be administered once a month, has less-frequent side-effects than the
oral form of the medication; however, D.P.'s insurance had not approve the injectable
form. Dr. Raichman assured the trial court that he would appeal to D.P.'s the
insurance company following the hearing to allow D.P. to take the injectable form. 
Dr. Raichman testified that there are no effective alternative medications or
treatments that would have fewer adverse side-effects than the proposed medication.

 Dr. Raichman also testified regarding D.P.'s prognosis. According to Dr.
Raichman, without medication, D.P.'s prognosis is as follows: "Continued
hospitalization, paranoia, delusion[s], potential danger to his family and community." 
In contrast, with medication, Dr. Raichman testified that D.P.'s hospitalization would
be shortened, and he would be able to return to work. In sum, "He would be happy,
everybody safer."

 Dr. Raichman also opined that D.P. lacked the capacity to make a decision
regarding medication. Dr. Raichman explained that D.P. lacked capacity because
"he's delusional and doesn't think that he is sick." Dr. Raichman confirmed that D.P.
told him that he is not "sick." 

 Considering all the evidence in the light most favorable to the finding, we
conclude a reasonable trier of fact could have formed a firm belief or conviction that
D.P. lacked the capacity to make a decision regarding administration of the proposed
medication. See J.F.C., 96 S.W.3d at 266. Accordingly, we hold that the evidence
is legally sufficient to support the trial court's medication order. See A.S. v. State,
286 S.W.3d 69, 73 (Tex. App.--Dallas 2009, no pet.) (holding that doctor's
testimony that patient did not "understand the nature of her mental illness or the
necessity of the medications" was legally-sufficient evidence to support no capacity
finding); State ex rel. J.L.G., No. 12-06-00055-CV, 2006 WL 2465623, at *7 (Tex.
App.--Tyler Aug. 25, 2006, no pet.) (mem. op.) (holding that doctor's testimony that
patient lacked capacity based on patient's "marked delusional denial of his illness"
was legally sufficient to support lack-of-capacity finding).

 In support of his factual-sufficiency challenge, D.P. points to his testimony that
he did not want to take the proposed medication because, in the past, he had suffered
side-effects from it. D.P. testified that when he is taking the medication, "my lips
start ticking." He also stated that the medication "just makes me crazy." According
to D.P., the medication made him hyperactive, causing him "to be unable to sit still." 
D.P. told the trial court that these side-effects adversely affected his ability to perform
his job. D.P. acknowledged that he had been employed in the past while taking
medication, but claimed that he was not able to work to "the best of my ability." 

 In addition, D.P. points out that Dr. Raichman acknowledged that D.P. had
articulated to him the manner in which the medication had adversely affected him in
the past. Dr. Raichman also acknowledged that he and D.P. had discussed the
benefits and the adverse side-effects of the medication, and that D.P. had described
the benefits of the medication. 

 Further, D.P. relies on his own testimony regarding his employment as a
purchasing agent for a hospital chain. He claims that, because he frequently makes
decisions for his employer, it follows that he should be able to make decisions
regarding his own medical treatment.

 As with any factual-sufficiency review, we give due consideration to the
evidence that the trial court in this case could have reasonably found to be clear and
convincing evidence that D.P. lacked the capacity to make a decision regarding
administration of the proposed medication. See C.H., 89 S.W.3d at 25. Here, the
evidence showed that D.P. denied the fact that he suffers from paranoid
schizophrenia. A fact otherwise unrefuted. D.P.'s testimony also indicated that he
believed that his difficulties over the years had been caused by medication, not his
mental illness. 

 From this evidence, the trial court could have inferred that D.P. lacked the
ability to make a decision whether to undergo the proposed treatment. See Tex.
Health & Safety Code Ann. § 574.101(1). D.P.'s ability to understand the risks
and the benefits of the medication are irrelevant if he not only lacks insight into his
own mental illness, but denies it entirely. While he may be able to describe the
benefits of the medication, D.P. cannot weigh the benefits against the adverse effects
if he incorrectly believes that the benefits have no application to him. 

 In light of the entire record, we conclude that the trial court could have
reasonably formed a firm belief or conviction that D.P. lacked the capacity to make
a decision regarding administration of the proposed medication. See C.H., 89 S.W.3d
at 25; see also A.S., 286 S.W.3d at 73 (holding evidence to be factually sufficient to
show lack of capacity when patient did not understand her mental illness, even though
patient testified that medication made her feel "ill"). We hold that the evidence is
factually sufficient to support the trial court's medication order. 

 We overrule D.P.'s sole issue in appellate cause no. 01-10-000002-CV.

 Conclusion 


 We affirm the trial court's order of commitment for temporary in-patient mental
health services (appellate cause no. 01-09-00097-CV) and the trial court's order to
administer psychoactive medication (appellate cause no. 01-10-00002-CV).





 


 Laura Carter Higley

 Justice


Panel consists of Chief Justice Radack and Justices Alcala and Higley.
1. Although the specified term of both orders--a period not to exceed 90 days--has
expired, the mootness doctrine does not apply to D.P.'s appellate challenges. See J.M.
v. State, 178 S.W.3d 185, 189-90 (Tex. App.--Houston [1st Dist.] 2005, no pet.)
(citing Lodge v. State, 608 S.W.2d 910, 912 (Tex. 1980) and discussing reasons why
mootness doctrine does not apply when terms of such orders have expired). 
2. D.P.'s issues are framed as factual-sufficiency challenges; however, in the body of his
brief, D.P. appears to also assert a legal-sufficiency challenge to both orders. 
3. The record does not indicate that D.P. waived this requirement.
4. Section 574.106 has been amended since the trial court signed the order in this case. 
See Act of May 29, 2009, 81st Leg., R.S., ch. 624, § 1, sec. 574.106, 2009 Gen. Laws
1407, 1407-08. However, the amendments are not germane to the issue before us. 
Therefore, for ease of reference, we cite the current version of the statute.